**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Andrew James Olafson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:14-cv-90 |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Ann Schulz, Wanda Bear, Della Lee, Karen | ) | |
| Marzolf, Jan Schultz, Shawn Lee, Chad | ) | |
| Schultz, Charles Alexander, Mike James | ) | |
| Grenz, Kerry Wicks, Randy Switters, Alex | ) | |
| Schweitzer, Travis Bullock, Lynette Laber, | ) | |
| Claudia Hoyt, Shari Carr, Carley Randall, | ) | |
| Dr. Mark Rodlund, Marilyn Slaughter, and | ) | |
| JoMarie Wiest, | ) | |
| | ) | |
| Defendants.[1] | ) | |

Plaintiff Andrew James Olafson, a prisoner proceeding pro se and in forma

pauperis, filed a complaint and supplements to the complaint alleging violations of 42

U.S.C. § 1983 while he was confined as a sexually dangerous individual (SDI) at the

North Dakota State Hospital (NDSH). Olafson is currently incarcerated at the North

Dakota State Penitentiary (NDSP), serving a term of imprisonment imposed after he

was convicted of assaulting NDSH staff and other crimes he committed while at NDSH.

Defendants[2] moved for summary judgment on all claims not stayed by an earlier

---

[1] In his pleadings, Olafson misidentified several of the defendants. He misidentified Dr. Mark Rodlund as Dr. Mark Rallond, Lynette Laber as Lynette Hogelson, Marilyn Slaughter as Mariyln Slaughter, Shari Carr as Sharr Carr, JoMarie Wiest as Jomarie Wasteland, and Travis Bullock as Travis R. Bullock. Additionally, Olafson did not include Claudia Hoyt's last name, so in previous orders the court referred to her as Claudia LNU. The docket was corrected in a recent order. (See Doc. #109).

[2] When this report and recommendation refers to "defendants," it refers to those defendants other than Kerry Wicks, Alex Schweitzer, and Dr. Mark Rodlund. An earlier order of the court stayed the claims against Wicks, Schweitzer, and Rodlund. (See Doc. #21). Thus, defendants' motion does not concern the claims against them.

court order, claiming Olafson has not stated a claim upon which relief can be granted. (Doc. #90). Alternatively, defendants contend they are entitled to qualified immunity. (Doc. #92, pp. 43-45). Olafson responded to the summary judgment motion, (Doc. #104), and defendants filed a reply, (Doc. #107).

## Summary of Recommendation

Olafson has not met his burden of setting forth facts, other than his own conclusory statements, showing any genuine issue for trial with regard to any claims which were not stayed by a previous court order. Additionally, because there are no disputed facts material to the alleged constitutional violations, defendants are entitled to qualified immunity. Defendants' motion for summary judgment should be granted.

## Procedural Background

Olafson's complaint and supplements identified forty-five current or former NDSH employees as defendants. An October 16, 2015 order[3] issued after initial review of the complaint and supplements, pursuant to the Prison Litigation Reform Act, 28 U.S.C. § 1915A, (1) dismissed the NDSH and all defendants in their official capacities and (2) dismissed several personal capacity claims.[4] (Doc. #16). The October 16th order found that Olafson had stated several plausible claims but that he had not sufficiently identified the defendants alleged to have been personally responsible for the alleged deprivations of constitutional rights. Thus, the court allowed Olafson to supplement the

---

[3] The initial reviews were conducted pursuant to Olafson's consent to magistrate judge jurisdiction. (See Doc. #10).

[4] A November 16, 2015 order partially vacated the October 16th order, insofar as the October 16th order dismissed some of Olafson's personal capacity claims. (See Doc. #21).

claims by completing a form, which Olafson filed on October 22, 2015.[5] The October 16th order further found that Olafson had stated facially plausible claims against three individuals.

In a November 16, 2015 order, the court considered all of Olafson's filings to that date, collectively, pursuant to § 1915A.[6] (Doc. #21). The court found that Olafson had either failed to allege any personal involvement or failed to state a plausible claim against twenty-five individuals, and the complaint was dismissed as to those individuals. The court also dismissed several claims because Olafson had not sufficiently identified any defendants personally involved with the claim, had not given defendants fair notice of the claim and the grounds upon which it rests, or had not stated a plausible claim.

Further, the November 16th order stayed three of Olafson's claims, without considering their merits, pending resolution of <u>Ireland v. North Dakota</u>, D.N.D. Case No. 3:13-cv-3. Specifically, the claims stayed are those against Alex Schweitzer and Kerry Wicks, alleging that an evaluation which resulted in Olafson's classification as an SDI was done by someone who possessed child pornography and that Olafson received a bill from NDSH when he should not have been confined there. The court also stayed Olafson's claim against Dr. Mark Rodlund, which alleges that Olafson receives better treatment at NDSP than he had at NDSH. Since the court stayed the claims against Schweitzer, Wicks, and Rodlund without considering their merits, the court directed the

---

[5] Olafson identified the forty-fifth defendant in the October 22nd supplement.

[6] The November 16, 2015 order considered documents filed in the docket at 6, 7, 12, 17, and 18.

Clerk not to effect service upon those defendants at this time.[7]

As discussed in the October 16th and November 16th orders, the court concluded that Olafson had stated plausible claims (1) against Charles Alexander for excessive force; (2) against Ann Schulz, Lynette Laber, Karen Marzolf, and Marilyn Slaughter for deliberate indifference to serious medical needs; (3) against Claudia Hoyt, Marilyn Slaughter, and Carley Randall for administering chemical restraints in violation of Olafson's due process rights; (4) against Claudia Hoyt and Carley Randall for sexual harassment or abuse; (5) against Jan Schultz, Wanda Bear, Marilyn Slaughter, Karen Marzolf, and Mike James Grenz for deliberate indifference to health or hygiene needs; (6) against Lynette Laber, Ann Schulz, and Shari Carr for improper restrictions on telephone access; (7) against Travis Bullock, Chad Schultz, Randy Switters, Wanda Bear, Della Lee, Shawn Lee, JoMarie Wiest, and Ann Schulz for deprivation of religious mail; and (8) against Chad Schultz and Travis Bullock for unreasonable deprivation of personal property. The defendants now seek summary judgment on each of the claims that survived initial review.

Olafson's complaint and supplements include no dates on which the alleged constitutional violations occurred. Defendants state that they reviewed NDSH records for the six-year period preceding the October 1, 2014 filing of the complaint and assert a statute of limitations defense with regard to several claims. (See Doc. #92). But, defendants did not timely raise a statute of limitations defense. Shortly before filing

---

[7] Although the court directed the Clerk not to serve Rodlund, the Clerk sent a request for waiver of service on his behalf to the North Dakota Attorney General. (Doc. #48). Rodlund subsequently filed an executed waiver of service and answer to the complaint. (Doc. #68; Doc. #70).

their summary judgment motion, defendants sought leave to amend their answer to assert a statute of limitations defense. (See Doc. #89). Since the deadline for motions to amend the pleadings had passed and the defendants had not demonstrated good cause to modify the scheduling order, the court denied defendants' motion. (See Doc. #93). Thus, the court should not consider any statute of limitations defense.

## Factual Background

Facts specific to each of Olafson's claims are discussed in connection with the analysis of each claim. But, a brief review of Olafson's status at NDSH is provided as background.

Olafson was first admitted to NDSH for evaluation as an SDI on May 13, 2005, and was civilly committed as an SDI on January 17, 2006. (Doc. #92-30, p. 1). Although still subject to an SDI commitment, Olafson has not consistently resided at NDSH. He was in the custody of the Stutsman County Correctional Center (SCCC) and the North Dakota Department of Corrections and Rehabilitation (DOCR) from December 23, 2011, until October 10, 2012, after being arrested and subsequently convicted for simple assault on an NDSH staff member. (Doc. #92-33, p. 5; Doc. #92-40; Doc. #92-41). He was again in the custody of SCCC and DOCR from November 30, 2012, until November 6, 2013, after being arrested and subsequently convicted a second time for simple assault on an NDSH staff member. (Doc. #92-33, p. 5; Doc. #92-37; Doc. #92-38). Finally, he was transferred to the custody of SCCC on March 26, 2014, after being arrested for disorderly conduct and simple assault on NDSH staff members. (Doc. #92-22; Doc. #92-25 to -29; Doc. #92-33, p. 5). Olafson was subsequently convicted of those charges and remains in DOCR custody as of today's date. Id.

While at NDSH, Olafson primarily resided in Secure One—the most restrictive housing unit.[8] (See Doc. #92-33). "Secure One is a unit designed for the most behaviorally[] problematic and/or treatment resistant residents requiring the highest level of monitoring." (Doc. #92-31, p. 5). At times, Olafson resided on Secure Two—a unit for residents with special needs, (see Doc. #92-30, p. 2; Doc. #92-31, pp. 5, 7-8, 19-21; Doc. #92-33)—and Secure Three—a unit for cognitively-impaired individuals, (see Doc. #92-31, pp. 7-8; Doc. #92-33).

According to an affidavit of an NDSH administrative assistant, NDSH utilizes a grievance process for residents to "communicate their needs or concerns." (Doc. #92-2, p. 1). If a resident has a concern that is not resolved by speaking directly with NDSH staff, that resident may submit a "Communicate Your Needs/Team Request Form" (CYN form) to any staff member, who forwards it to the "Clinical Team." Id. at 1-2. The Clinical Team is to respond within three "working days," and if a resident is not satisfied with the response, that resident may submit a "Grievance Form" to any staff member, who forwards it to the "Secure Services Administration." Id. at 2. The administration is to respond within five "working days." Id.; (see also Doc. #92-34, p. 7) (NDSH grievance process policy).

## Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears

---

[8] At times, Olafson also resided in the intensive care unit within Secure One. (Doc. #92-31, pp. 9-10, 18).

the burden of establishing the basis for its motion. <u>Donovan v. Harrah's Md. Heights Corp.</u>, 289 F.3d 527, 529 (8th Cir. 2002). When the moving party demonstrates that no material facts are in dispute, the nonmoving party then bears the burden of setting forth facts showing a genuine issue for trial. <u>Id.</u> While the court must view all facts and inferences in the light most favorable to the nonmoving party, <u>id.</u>, "[f]actual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is appropriate if no reasonable jury could return a verdict for the nonmoving party. <u>Id.</u>

**Discussion of Olafson's Claims**

## 1.    Excessive Force

Olafson alleges an excessive force claim against Charles Alexander. Olafson contends that another resident "antagoniz[ed]" him, which caused Olafson to become "very aggressive towards three different staff members." (Doc. #7, p. 5). Olafson states that Alexander then shoved him, causing Olafson to hit a sharp edge of a metal bed frame, resulting in a broken rib.[9] <u>Id.</u> at 5-6; (<u>see also</u> Doc. #6, p. 9; Doc. #12, p. 3; Doc. #12-4, p. 5; Doc. #15, p. 2).

In an affidavit, Alexander states that on March 1, 2014, he responded to a report that someone was in immediate danger in Olafson's housing unit.[10] (Doc. #92-1, p. 2).

---

[9] Defendants interpret Olafson's complaint and supplements as alleging that Alexander used excessive force on three dates—March 1, 2014, March 3, 2014, and March 4, 2014. (Doc. #92, p. 11). This court views Olafson's complaint and supplements as describing only one incident regarding Alexander. (<u>See</u> Doc. #6, p. 9; Doc. #12-4, p. 5). The discrepancy, however, is irrelevant since Alexander interacted with Olafson on only one of those dates—March 1, 2014. (<u>See</u> Doc. #92-1, p. 2).

[10] In an affidavit, Karen Marzolf states that "[t]he incident started when Olafson was arguing with a peer and staff intervened." (Doc. #92-13, p. 4). She describes Olafson

The staff member in charge of the unit reported that Olafson would not comply with a demand to return to his room, so "a locked door order was signed." Id. Alexander states that, as he and others escorted Olafson to his room, Olafson kicked the staff member in charge, yelled, and did not follow commands. Id.; (see also Doc. #92-3, p. 2; Doc. #92-13, p. 4; Doc. #92-23, pp. 7-8; Doc. #92-45, p. 2; Doc. #92-46, p. 1; Doc. #92-47) (describing Olafson's aggression, including kicking a staff member). Alexander states that he placed Olafson on the bed in his room but as Alexander was exiting the room, "Olafson rushed the door." Id. Alexander states that he escorted Olafson to his bed again and instructed him to stay on the bed, but Olafson "refused and continued to advance." Id. As Alexander was exiting the room a second time, he states that he saw Olafson move toward him and, as he turned, Olafson "punched" him.[11] Id. at 3. Alexander states that he then pushed Olafson away to prevent any further assault, that he recalls "Olafson falling on his butt and/or back onto his mattress," and that "Olafson did not fall on a metal bedframe or any other type of frame." Id.

The court has reviewed video of the March 1st incident.[12] Olafson appears agitated and interacts with staff in a hallway for approximately ten minutes before

as having been verbally abusive and threatening. Id. She states that she offered Olafson "medication to calm down," that Olafson took the oral medication, but that the medication was not effective and Olafson "continued to exhibit aggressive behavior." Id. She states that staff convinced Olafson to go to a different housing unit and, once he was in that unit, they "tried to talk Olafson into going into his room to calm down" but Olafson continued to be abusive. Id.

[11] Other NDSH staffs members' affidavits and NDSH records describe Olafson punching Alexander in the head and punching at other staff members. (See Doc. #92-3, p. 2; Doc. #92-13, p. 5; Doc. #92-23, pp. 7-8; Doc. #92-45, p. 2; Doc. #92-46, p. 1; Doc. #92-47).

[12] The video footage includes no audio recording.

Alexander enters the housing unit. (See Doc. #42, video, 6:13:03-6:23:05). Alexander and another staff member are seen grabbing Olafson's arms to physically take Olafson to a room. On the way to the room, Olafson was resistant and kicked an individual. Alexander and the staff member assisting him put Olafson onto a bed in the room.[13] As they were exiting the room, Olafson charged the door, and Alexander and the other staff member put him back onto the bed. After Alexander and the other staff member released Olafson, he immediately got up. Alexander held Olafson back by placing his hands on Olafson's chest. As Alexander and the other staff member were exiting the room, Olafson continued to advance toward them. When Alexander turned to exit the room, Olafson punched him. Alexander then turned back toward Olafson and shoved him. Olafson landed on his back on the bed and then flipped over backward off the bed as the mattress slid off the frame. Id. at 6:23:05-6:28:40. Several staff members then restrained Olafson on the floor while other staff members attached restraint straps to the bedframe. Id. at 6:28:40-6:39:00. Thereafter, Olafson was strapped to the bed.[14] Id. at 6:39:00-6:42:00.The video does not show Olafson hitting an edge of the bed frame.

As a result of the March 1st incident, Olafson was charged with two counts of simple assault—one count for punching Alexander and one count for kicking the staff member in charge. (Doc. #92-24). Additionally, he was charged with disorderly conduct

---

[13] The bed consists of a frame, which sits directly on the floor, and a thin mattress. The frame and mattress appear to total about one foot in height.

[14] The straps were attached to the frame, the mattress was placed on the frame, and Olafson was placed on top of the mattress with his wrists and ankles in the restraint straps.

for spitting on another staff member's face. Id.; (see also Doc. #92-3, p. 9) (staff member's statement regarding Olafson spitting on his face). According to a highway patrol officer's report, Olafson admitted the conduct and stated he would "keep hitting people and spitting on them until he goes back to jail." (Doc. #92-3, p. 4). Olafson pleaded guilty to the three charges.[15] (Doc. #92-25; Doc. #92-29).

Defendants contend that the force Alexander used was reasonable and necessary to prevent Olafson from further assaulting staff members and that no evidence demonstrates Olafson suffered any injury. (Doc. #92, p. 31). In response to the motion, Olafson maintains that he suffered a broken rib as a result of Alexander pushing him but—contrary to his earlier pleadings—now states that he did not report that injury to NDSH staff because they would not have believed him. (Doc. #104, pp. 3-4). Olafson does not deny punching Alexander but states there was "not even a red mark on the right side of [Alexander's] face." Id. at 9. Olafson also contends that Alexander used excessive force when he sat on Olafson's legs to restrain him while other staff members were attaching restraint straps to the bedframe. Id.

A civilly committed individual's claim of excessive force is evaluated under the objective reasonableness standard applied to similar claims by pretrial detainees. Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001); see also Carter v. Hassell, 316 F. App'x 525, 526 (8th Cir. 2008) (unpublished opinion) (applying the objective reasonableness standard to a civilly committed sex offender's claim that an official hit him with a walkie-talkie); Ingrassia v. Schafer, No. 4:11CV02062, 2014 WL 4967011, at

_____

[15] Olafson was also charged with other counts relating to incidents at NDSH on March 3rd and March 4th. (See Doc. #92-24, pp. 2-4).

*8 (E.D. Mo. Sept. 30, 2014) (evaluating civilly committed sexually violent predator's claim that defendants used excessive force in restraining him under the objective reasonableness standard). When institutional authorities use force in response to a disturbance, the court must consider the need for application of force, the relationship between the need and the degree of force used, the extent of the injury inflicted, whether force was used for punishment or to maintain order or security, and whether a reasonable official would have used similar force in similar circumstances. Andrews, 253 F.3d at 1061 n.7.

Olafson was admittedly "very aggressive towards three different staff members," and therefore the application of force was necessary to maintain order and security. The video demonstrates Olafson was hostile—including kicking and hitting staff members. Alexander shoved Olafson onto a mattress only after Olafson advanced toward and punched Alexander as he was trying to leave the room. Additionally, it was necessary for Alexander to restrain Olafson's legs until he was placed in restraints due to Olafson's aggression.[16] In this court's opinion, a reasonable officer would have used similar force in similar circumstances and no reasonable jury would find otherwise. Further, no evidence confirms that Olafson was injured in the incident. While Olafson maintains he suffered a broken rib, he admittedly failed to report that injury. Even if Olafson was

---

[16] In response to defendants' summary judgment motion, Olafson asserts an intentional infliction of emotional distress claim against Alexander. (See Doc. #104, p. 13). But, the court previously dismissed that claim with prejudice. (See Doc. #16, pp. 24-25; Doc. #21, pp. 22-23). Regardless, the new facts Olafson alleges in his response—that Alexander put his body on Olafson's lower legs to restrain him—do not describe conduct which is extreme and outrageous, as is required to support a state law claim for intentional infliction of emotional distress. See Kautzman v. McDonald, N.W.2d 871, 876 (N.D. 2001).

injured, that would not necessitate a finding that, under the circumstances, the force Alexander used was excessive. Olafson has not met his burden of setting forth facts, other than his own conclusory statements, showing any genuine issue for trial on his excessive force claim. Alexander should be granted summary judgment on Olafson's excessive force claim.

**2.    Deliberate Indifference to Serious Medical Needs**

In the complaints and supplements, Olafson alleges that Ann Schulz, Lynette Laber, Karen Marzolf, and Marilyn Slaughter were deliberately indifferent to his serious medical need—a broken rib. As discussed above, Olafson contended he suffered a broken rib after Alexander shoved him, causing him to hit a sharp edge of a metal bed frame. Olafson stated that Schulz, Laber, Marzolf, and Slaughter "knew [that he was] in need of medical attention" but "refused to provide [him] care" and "refused" to permit him to be examined by a doctor or nurse, stating that he did not "have a[] broken left rib." (Doc. #17, pp. 1-2). Olafson further alleged that he filed grievances concerning the lack of medical care for a broken rib. (Doc. #6, p. 2).

But, in response to the current motion, Olafson contradicts his earlier claim that Schulz, Laber, Marzolf, and Slaughter knew about the alleged rib injury. He states that he did not report a rib injury "because they wouldn't believe [him] if [he] told them that [he] had suffered a broken left rib." (Doc. #104, p. 4). He also states that he received ibuprofen for back pain but that he also used that medication for rib pain. Id. He states that he used his back pain as a "cover up" so "they" would not know about his rib pain and his plan to raise an excessive force claim against Alexander. Id.

In affidavits, Schulz, Laber, Marzolf, and Slaughter state that Olafson never reported any rib injury, nor did they ever refuse Olafson medical attention for a rib injury. (Doc. #92-10, p. 2; Doc. #92-13, pp. 2-3; Doc. #92-18, p. 2; Doc. #92-19, p. 2). Defendants submitted an affidavit of an NDSH administrative assistant who states that Olafson filed no CYN or grievance forms regarding a rib injury. (Doc. #92-2, p. 2). Additionally, defendants submitted an affidavit of an NDSP office assistant who stated that she reviewed Olafson's NDSP medical records and that Olafson never complained of a rib injury or rib pain while at that facility. (Doc. #92-15, p. 2). Olafson responds that he did not receive any medical attention at NDSP for his rib injury because the injury had healed properly. Id. at 5.

A right to medical care while civilly committed arises under the Due Process Clause of the Fourteenth Amendment but is analyzed under the deliberate indifference standard of the Eighth Amendment. See Scott v. Benson, 742 F.3d 335, 339 (8th Cir. 2014). To state a plausible claim of deliberate indifference to medical needs under the Eighth Amendment, an individual must demonstrate two elements: (1) that his medical needs were "objectively serious," and (2) that officials "actually knew of but deliberately disregarded those needs." Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015) (quoting Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

Assuming that Olafson suffered a rib injury, he has not demonstrated that Schulz, Laber, Marzolf, or Slaughter actually knew about that injury. Olafson provided only conclusory allegations in his complaint and supplements, which he contradicted in response to defendants' summary judgment motion. Olafson provides no evidence that Schulz, Laber, Marzolf, and Slaughter actually knew of but were deliberately indifferent

13

to any rib injury. Olafson has not met his burden of setting forth facts, other than his own conclusory and contradictory statements, showing any genuine issue for trial on this claim. Schulz, Laber, Marzolf, and Slaughter should be granted summary judgment on Olafson's deliberate indifference to serious medical needs claim.

### 3.     Chemical Restraints

Olafson alleges that Claudia Hoyt, Marilyn Slaughter, and Carley Randall administered chemical restraints in violation of his due process rights. Olafson alleges three separate incidents during which Hoyt, Slaughter, and Randall administered chemical restraints without a doctor's permission and without it being promptly recorded in his medical chart.[17] (Doc. #7, pp. 7-8). Olafson further asserts that it is inappropriate for female nurses to give shots to male patients.

The first incident Olafson alleges occurred after the March 1, 2014 incident which is the subject of the excessive force claim. Olafson states he was "put into 4 point restraints" attached to the metal bed frame and that Hoyt gave him a shot "to put [him] down" but that she was not qualified to do so. (Doc. #7, p. 5); (see also Doc. #6, p. 9). Further, Olafson contends that Slaughter administered a chemical restraint during an alleged second incident, (Doc. #17, p. 2), and that Randall administered a chemical restraint to sexually assault him during an alleged third incident, (Doc. #18, p. 3).

---

[17] In the complaint and supplements, Olafson did not specifically allege that the use of chemical restraints was not authorized by a physician or was not promptly recorded in his medical chart; rather, he stated that those measures were required under state law. (Doc. #7, pp. 7-8). Liberally construing Olafson's complaint, the court inferred that he made those claims. (See Doc. #16, p. 5 n.1).

In an affidavit, Hoyt states that, as a licensed practical nurse, she is qualified to administer chemical restraints and that she only administered injections and/or chemical restraints to Olafson pursuant to doctors' orders. (Doc. #92-8, p. 2); (see also Doc. #92-51) (verification of Hoyt's license from the North Dakota Board of Nursing). She states that on March 3, 2014, she administered an injection as ordered by a family nurse practitioner.[18] Id. at 2-3; (see also Doc. #92-50, p. 37) (doctor's order—effective from November 18, 2013, through August 3, 2014, providing for administration of medication by injection as needed if Olafson was agitated or aggressive). In an affidavit, Slaughter states that she is a registered nurse who is qualified to give shots but that she does not recall having administered any injections or chemical restraints to Olafson. (Doc. #92-19, p. 3). Slaughter further states that if she had administered an injection, it would have been pursuant to a doctor's orders. Id.; (see also Doc. #92-50, pp. 7-38) (various doctor's orders providing for administration of medication by injection as needed if Olafson was agitated or aggressive). Lastly, in an affidavit, Randall states that since she is not a nurse or doctor, she had no access "to any medications in the form of a shot," and she "never administered an injectable chemical restraint to Olafson." (Doc. #92-14, p. 2).

Olafson has a due process right under the Fourteenth Amendment to not be given drugs against his will. Washington v. Harper, 494 U.S. 210, 229 (1990). "The forcible

_____

[18] A staff member's statement to a highway patrol officer refers to "Claudia" administering a shot on March 4, 2014, after Olafson threw urine on two staff members. (Doc. #92-23, p. 27). But, NDSH medication administration records show that Hoyt administered a shot to Olafson on March 3, 2014. (Doc. #92-49, p. 27). Those records also show that Olafson received an injection on March 1, 2014, but that someone other than Hoyt administered that shot. Id.

injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Id. In the prison context, where there are legitimate penological interests, it is permissible for a state to "to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227.

"The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison." Morgan v. Rabun, 128 F.3d 694, 697 (8th Cir. 1997). Maintaining the safety and security of staff and patients is a "vital interest." Id. If a doctor determines that a patient is a danger to himself and others, then administration of chemical restraints does not violate the patient's due process rights. Id.

Olafson provided only conclusory allegations regarding Randall and Slaughter. The evidence demonstrates that Randall, who is not a nurse or doctor, did not administer chemical restraints to Olafson as he alleges. Slaughter, although a registered nurse and qualified to administer chemical restraints to Olafson, states that she does not recall ever having administered a chemical restraint to Olafson but, if she had, it would have been pursuant to a doctor's orders.

Hoyt states that she only administered chemical restraints pursuant to a doctor's or nurse practitioner's orders. A doctor's order, effective November 18, 2013, through August 3, 2014, provided that Olafson was to be injected with aripiprazole as needed for agitation, aggression, and dangerousness. (Doc. #92-50, p. 37). The March 2014 injections were pursuant to that order. Thus, there is no evidence that chemical

restraints were given to Olafson without a doctor's orders and without having been properly recorded. Further, Olafson's contention that a female should not administer an injection to a male is without merit.

Olafson has not met his burden of setting forth facts, other than his own conclusory statements, showing any genuine issue for trial on his chemical restraint claim. Randall, Slaughter and Hoyt should be granted summary judgment on Olafson's claim that his due process rights were violated by any use of chemical restraints.

**4.    Sexual Harassment or Abuse**

Olafson alleges that Claudia Hoyt and Carley Randall made "sexual comments" which made him feel "very uncomfortable" and that Hoyt "made fun of [his] priva[]te parts." (Doc. #18, pp. 1, 3). He further asserts that Hoyt "touched or grabbed [his] balls" when she gave him a shot. Id. at 3. With regard to Randall, although Olafson alleged in his complaint that she "allow[ed] [him] to have sexual[] intercourse with her, because she knew that [he] had the biggest crush on her," (Doc. #7, p. 3), he later described that contact as "not consensual" and "not welcome," (Doc. #18, p. 3). Olafson further alleges that Randall "forced" him to have sex with her, that he "told her no many different times," that she had used chemical restraints "so that she could have sexual intercourse with" him, and that she admitted to doing so. Id.

In an affidavit, Hoyt states that when administering a chemical restraint to Olafson on March 3, 2014, he was completely dressed and she "pull[ed] the pants down just enough to give the shot" in the buttock muscle. (Doc. #92-8, p. 3). She states she did not look at, see, grab, or touch Olafson's genitals. Id. Additionally, she states she has never "made fun of" Olafson's genitals. Id. In her affidavit, Randall states that she never

used a chemical restraint on Olafson and she never engaged in sexual intercourse, sexual conduct, or any sexual behavior with Olafson. (Doc. #92-14, p. 2).

Olafson has reported that he has "fantasies of female staff" which "interferes with approximately 80% of his day." (Doc. #92-30, p. 1). Additionally, annual evaluations, court orders, and NDSH records describe Olafson's issues with sexual fantasies—including writing sexually explicit material about female staff members—and staring at female staff. (See Doc. #92-31, pp. 1-2, 7, 11, 13-14, 26-27; Doc. #92-32, pp. 5, 9-11; Doc. #92-36, pp. 8-9, 11, 13; Doc. #92-39, pp. 6-7, 17; Doc. #92-71, pp. 1-2; Doc. #92-72 to -74; Doc. #92-75, pp. 6, 12-13, 15, 17). In describing an interview which Olafson had with a doctor who was assessing him in connection with a petition for release, a state court judge stated that Olafson "admitted that he developed a crush on a female staff member, stares at female staff, and sees female staff as 'like a sexual toy to me.'" (Doc. #92-36, p. 11). The judge further stated that Olafson "admitted to fantasizing about [female staff] while staring at them." Id.

As a civilly committed individual, Olafson's sexual harassment claim arises under the Fourteenth Amendment. The Fourteenth Amendment provides civilly committed individuals and other detainees "at least the same level of constitutional protection as the Eighth Amendment." Nelson v. Shuffman, 603 F.3d 439, 446 n.3 (8th Cir. 2010); see also Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982). ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

To state a plausible sexual harassment claim under the Eighth Amendment, an individual must demonstrate two elements: (1) that the alleged abuse or harassment

caused pain, and (2) that the defendant acted with a sufficiently culpable state of mind. Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997) (quotations and citation omitted). Sexual harassment without physical contact or touching does not constitute an Eighth Amendment violation. See Howard v. Everett, 208 F.3d 218 (8th Cir. 2000) (per curiam).

Affidavits of both Hoyt and Randall state that they did not sexually harass or abuse Olafson. The evidence presented by defendants shows that Olafson harassed and wrote sexually explicit material about female staff, which might be similar to sexually explicit material he wrote in his complaint and supplements. There is no evidence that Olafson filed any CYN or grievance forms regarding the alleged harassment and abuse or ever reported any abuse to law enforcement. Additionally, Olafson did not respond to defendants' summary judgment motion with regard to his sexual abuse and harassment claims. No reasonable jury could conclude that Randall, Slaughter, or Hoyt sexually harassed or abused Olafson. Therefore, Olafson has not met his burden of setting forth facts showing any genuine issue for trial on this claim. Randall, Slaughter, and Hoyt should be granted summary judgment on Olafson's sexual abuse and harassment claims.

**5.    Deliberate Indifference to Health Needs—Proper Hygiene**

Olafson alleges that Jan Schultz, Wanda Bear, Marilyn Slaughter, Karen Marzolf, and Mike James Grenz refused him showers and clean clothes for eight or nine days and that, during that time, he was not allowed shampoo, lotion, soap, toothpaste, or a toothbrush. (Doc. #18, p. 2).

In an affidavit, Slaughter states that, as a registered nurse, she worked in a building separate from where Olafson resided and had no involvement with any hygiene-related decisions. (Doc. #92-19, p. 3). In other affidavits, Schultz, Bear, Marzolf, and Grenz state that they "do not recall any situation where Olafson was denied" hygiene products and that none of them ever personally denied him hygiene products, clean clothes, or an opportunity to shower.[19] (Doc. #92-4, p. 3; Doc. #92-1, p. 3; Doc. #92-13, pp. 3-4; Doc. #92-17, p. 2). Marzolf further states that when she worked in Olafson's housing unit, Olafson slept most of the day and commonly refused to shower. (Doc. #92-13, p. 3).

An NDSH record states that Olafson "ha[d] been refusing to shower and change clothes" from March 5, 2014, to March 11, 2014. (Doc. #92-72, p. 2). A March 8, 2014 chart note states that Olafson <u>refused</u> to shower that day. Another chart note states that Olafson repeatedly <u>requested</u> to shower on March 10, 2014,[20] but it does not state

---

[19] Schultz, Bear, Marzolf, and Grenz each described situations in which Olafson would have been denied hygiene products, clean clothes, and shower access. They state that if a resident was "exhibiting inappropriate behavior, i.e., being aggressive or attacking staff," then that resident would be denied access to hygiene products, clean clothes, and an opportunity to shower until "the resident behave[d] in a nonthreatening or cooperative manner." (Doc. #92-4; Doc. #92-7; Doc. #92-13; Doc. #92-17). Additionally, residents would be denied hygiene-related requests for any safety reasons "occurring in the housing unit at that time." <u>Id.</u> Further, NDSH provides certain hygiene products at no cost, but if a resident requests other hygiene products, that request would be denied if the resident did not have money to purchase the product or if that resident were housed in Secure One since residents housed in Secure One are not permitted to purchase items from the NDSH commissary. <u>Id.</u>

[20] Records show that Olafson also requested clothes for court on March 10, 2014, but staff advised him that he had no court hearings that day. (Doc. #92-69, p. 9).

whether he was permitted to do so.[21] (Doc. #92-69, pp. 8-9). Another NDSH record states that from March 2, 2014, to March 18, 2014, Olafson was "only allowed to shower 5 times" due to behavioral issues. (Doc. #92-68, p. 3). NDSH records demonstrate that Olafson showered on March 3rd, 12th, 14th, 17th, and 18th. (Doc. #92-69, pp. 3, 10, 12, 14). Thus, it appears Olafson did not shower for an eight-day period from March 4th through March 11th, as he asserts in his complaint and supplements. It also appears that, at times during that period, Olafson refused to shower and, at other times, he was not permitted to shower. Further, the records reflect that Olafson's behavior was problematic during the eight-day period—e.g., he kicked staff members, covered the camera in his room, spit on another resident, banged on walls and a door, openly masturbated while female staff monitored a surveillance camera, and demanded to be taken to the county jail. Id. at 5-10.

Defendants note that the time period during which Olafson did not shower followed his assaults on NDSH staff on March 1st, 3rd, and 4th and that "Olafson's behavior during this period was challenging." (Doc. #92, p. 26). Defendants state that, "given Olafson's violent and disruptive behavior," from March 4th to March 16th, "staff occasionally denied [him] a shower" and denied him clean clothes and hygiene items for, at most, two days.[22] Id. at 41. Defendants contend that Olafson has not identified any harm he suffered as a result of any denial of showers, clean clothes, or hygiene

---

[21] Randy Switters noted that Olafson requested a shower on March 10, 2014, but Switters is not among the defendants whom Olafson alleges refused him showers.

[22] Defendants do not cite the record to support their statement that staff denied Olafson hygiene products for, at most, two days, and the court has not located any such records. NDSH records submitted by defendants do not reflect whether Olafson was given clean clothes and hygiene products between March 4th and March 11th.

items. Id. In response, Olafson acknowledges his "inappropriate or aggressive behavior." (Doc. #104, p. 7). But, he contends that he should not have been refused a shower because of that behavior or that staff should have, at minimum, provided him with clean clothes and hygiene items. Id.

A right to proper hygiene while civilly committed arises under the Due Process Clause of the Fourteenth Amendment but is analyzed under the deliberate indifference standard of the Eighth Amendment. Beaulieu v. Ludeman, 690 F.3d 1017, 1045 (8th Cir. 2017). To state a plausible claim of deliberate indifference to health needs under the Eighth Amendment, an individual must demonstrate two elements: (1) that the conditions posed a substantial risk of serious harm, and (2) that officials were deliberately indifferent to or disregarded the plaintiff's health needs. Id.

Civilly committed individuals are entitled to "the minimal civilized measure of life's necessities," which includes basic personal hygiene. See Farmer v. Brennen, 511 U.S. 825, 834 (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Generally, deprivation of showers and personal hygiene items for a few days does not rise to the level of a constitutional violation. See Williams v. Delo, 49 F.3d 442, 444–45 (8th Cir. 1995) (prisoner placed in segregation cell without clothes, running water, toothbrush, toothpaste, deodorant, soap, sheets, blankets, and a mattress for a period of four days was not deprived of the minimal civilized measure of life necessities).

Here, it is undisputed that Olafson did not shower for an eight-day period. Olafson had refused to shower on several of those days, and on other days he was not permitted to shower due to his offensive behavior. Courts have held that denial of showers for eight or more days without any physical injury or harm does not violate the

Eighth Amendment. See Morrison v. Brazell, No. 4:12-cv-04084, 2013 WL 1411219, at *2 (W.D. Ark. Mar. 19, 2013); Johnson v. Norris, No. 2:08CV00052, 2008 WL 2952015, at *2 (E.D. Ark. July 29, 2008); McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003). The only harm Olafson contends he suffered as a result of not showering was that he did not "feel good about [himself]." (Doc. #104, p. 7).

With regard to hygiene products and clean clothes, NDSH records do not indicate whether any were withheld during the eight-day period, but defendants acknowledge that hygiene products and clean clothes may have been withheld for, at most, two days. Even if those items were withheld for the entire eight-day period, Olafson has not demonstrated personal involvement of any of the defendants named on this claim. Government actors who are sued in their individual capacities can be held liable for money damages only if they were personally involved in or were directly responsible for an alleged deprivation of rights. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). Slaughter was not involved in any hygiene-related decisions, and Schultz, Bear, Marzolf, and Grenz state they never personally denied Olafson hygiene products, clean clothes, or an opportunity to shower. Olafson has not met his burden of setting forth facts showing any genuine issue for trial on this claim. Slaughter, Schultz, Bear, Marzolf, and Grenz should be granted summary judgment on Olafson's claim of deliberate indifference to health or hygiene needs.

### 6. Telephone Access Restrictions

Olafson alleges that Lynette Laber, Ann Schulz, and Shari Carr restricted his telephone access and advised those who called, including Olafson's attorney, that he was "not available." (Doc. #17, p. 2). He further contends the he was not allowed use of a

telephone without staff verification of identity of the other person on the line, (Doc. #12, p. 3), and that he was not permitted to call his attorney, (Doc. #18, p. 1), or his family, (Doc. #15, p. 2).

In affidavits, Laber, Schulz, and Carr state that, per NDSH policy, residents can make calls using phone cards[23] "during their designated times" and can make limited calls at NDSH expense—WATTS calls.[24] (Doc. #92-6; Doc. #92-10; Doc #92-18); (see also Doc. #92-34, p. 4 and Doc. #92-35, pp. 3, 8, 29, 13, 18, 24, 29) (NDSH phone policies). Outside persons may call a unit's phones directly, and those calls are answered by the residents. Id. But, if an outside person calls for a resident on an NDSH business line, that call is forwarded to the "administrator's phone" since staff "cannot confirm or deny any residents' whereabouts due to [HIPAA] regulations."[25] Id. Additionally, NDSH policies provide that unit phones are turned off in the early morning and late evening, calls are limited to thirty minutes with an hour break between calls, residents may not use inappropriate language or behavior during calls, and any abuses of phone privileges result in restrictions of those privileges. Id. Restrictions can include permitting the resident to call "only those individuals who have been reviewed and approved" and/or requiring staff "to verify and monitor the call." Id. Generally, NDSH phone policies

---

[23] On Secure One, Secure Two, and—beginning in 2010—Secure Three, use of the phone system is "through a PIN # . . . supplied by the Security Supervisor." (Doc. #92-34, p. 4; Doc. #92-35, pp. 3, 8, 29, 13, 18, 24, 29).

[24] NDSH permitted Olafson "to make one WATTS call a month to a family member and one [WATTS] call a month to his attorney." (Doc. #92-6; Doc. #92-10; Doc. #92-18).

[25] In an affidavit, an NDSH administrative assistant states that calls for residents which come to the  Administrative Office are transferred to the unit phones which the residents answer. (Doc. #92-2, p. 1).

impose no restrictions on a resident's calls to attorneys "if the calls are within reason." Id.

Laber, Schulz, and Carr state that "Olafson was [often] housed in [a] unit that require[d] all residents to make staff assisted phone calls" and that because Olafson abused his phone privileges, he was required to have "an approved calling list." Id. They describe Olafson's abuses to include "calling random people in the phone book, calling the contacts of other residents to request money, and calling a commercial hotline repeatedly asking for a specific operator." Id. Because of those abuses, staff verified identity of the other person on the line during Olafson's calls. Id. Laber, Schulz, and Carr state they permitted Olafson to call his family and his attorney as long as it was within reason but that Olafson called his attorney excessively, causing his attorney to request that "Olafson limit the number of calls." Id.; (see also Doc. #92-55, p. 31) (NDSH record stating that Olafson's attorney requested no calls after office hours); (Doc. #92-57, pp. 15, 28) (NDSH records stating that Olafson's attorney requested that Olafson not call him daily). Laber, Schulz, and Carr contend that they "did not refuse to let Olafson make telephone calls to his family members or his attorney when his behavior was in accordance with policy" and "did not tell Olafson's family members or attorney that he was unavailable or not permitted to speak if that was not the case."[26] Id.

---

[26] Laber, Schulz, and Carr state that they would not have permitted Olafson to make calls outside of his designated times or to individuals not on his approved calling list. (Doc. #92-6; Doc. #92-10; Doc. #92-18). Additionally, they would not have permitted Olafson to make a call "if he was confined to his room, was out of control, was placed on restriction, or if his behavior at that time was inappropriate, i.e., if he was being physically abusive to the phone by slamming it into the wall." Id. They state that he would have been permitted to make a call once he "calmed down." Id.

NDSH records demonstrate Olafson's history of abusing phone privileges began in 2005, the year he was admitted to the hospital. Six times in 2005-2006, a doctor ordered various phone restrictions after Olafson made harassing phone calls. (Doc. #92-50, pp. 1-6). Throughout the time that Olafson resided at NDSH, records show that Olafson repeatedly made unverified or unauthorized calls, asked another resident to make a call for him, made calls outside of his designated times, fought with other residents and staff regarding the phone, erased a board on which residents scheduled phone time, and disrupted other residents while they were on the phone. (Doc. #92-55, pp. 4-5, 11, 21-22, 24-25, 33-43; Doc. #92-58, pp. 2, 4-9, 11, 13, 15, 17, 19-23, 25, 27, 29, 31, 33, 35, 37, 39; Doc. #92-74, p. 4). NDSH records further demonstrate that Olafson regularly made calls to and—if they answered—spoke with his family members and his attorney. (See Doc. #92-55, pp. 1-2, 4, 6-9, 11-15, 20, 24, 26-27, 31, 43; Doc. #92-56, pp. 2-5). Olafson was not permitted to make calls when no staff was available to verify a call, when Olafson refused to permit staff to verify a call, when he was agitated or aggressive, when he tried to make repeated calls to his attorney after his attorney had asked that the calls be limited, or when he refused to submit a CYN form as directed. (Doc. #92-55, pp. 10, 17, 24, 27-30, 32; Doc. #92-58, p. 41).

A January 10, 2010 psychological assessment stated that Olafson's mother was, at that time, "court ordered to make daily phone contact" and that Olafson talked on the phone with his mother and his attorney daily. (Doc. #92-30, pp. 2, 4). That assessment also stated that Olafson consistently received behavioral write-ups for "stealing other resident[s'] phone time." Id. at 4; (see also Doc. #92-31, pp. 5, 7, 10, 18) (noting Olafson's various phone violations). Olafson's May 4, 2011 annual evaluation stated that

Olafson was placed on a "phone plan where his outgoing and incoming calls [were] monitored" because he had contacted people in the community—including "elderly and developmentally disabled" individuals—to ask for money and games. (Doc. #92-31, p. 10). That annual evaluation also noted that Olafson had been calling his attorney "almost daily" and that he committed phone-related violations at least twelve times during that prior year. Id. at 28-30, 34, 37, 39-41, 44-45.

Defendants contend that any telephone restrictions placed on Olafson "were reasonably related to safety and security concerns" and that because residents answer the unit phones, staff would not have misinformed any incoming callers about Olafson's availability. (Doc. #92, pp. 35-36). Defendants further contend that Olafson's abuse of his phone privileges resulted in his attorney requesting that his calls be limited and that Olafson had alternative means to communicate with his attorney and family through mail and in person visits. Notably, Olafson did not respond to defendants' summary judgment motion with regard to his claim that his right to use of the telephone was unconstitutionally restricted.

Unreasonable restrictions on confined individuals' telephone use may violate their first amendment rights to communicate. See Benzel v. Grammar, 869 F.2d 1105, 1108 (8th Cir. 1989) (stating that inmates have a right to use the telephone, subject to rational limitations). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Turner established a four-part test to determine the reasonableness of a regulation: (1) whether there is valid, rational connection between the regulation and the governmental interest proffered as

justification for the regulation; (2) whether there are alternative means of exercising the right; (3) whether accommodation of the asserted right would impact others or the allocation of resources; and (4) whether a readily available alternative could fully accommodate the constitutional right at a de minimus cost to valid institutional interests. Id. at 89-91. (quotations and citations omitted). The Eighth Circuit has applied the Turner test to civilly committed sex offenders' challenges to telephone restrictions. See Beaulieu, 690 F.3d at 1039.

In this court's opinion, restrictions on Olafson's use of the telephone were reasonably related to NDSH's safety and security interests and community safety interests. Evidence before the court shows that Olafson fought with other residents regarding the phone and made harassing phone calls to various community members. Restrictions on his phone use were therefore warranted and reasonable, including the requirement that staff verify identity of the other person on the line. Additionally, since other residents, rather than staff, answer incoming calls to unit phones, Olafson's claim that Laber, Schulz, and Carr advised those who called—even though on his approved calling list—that he was unavailable is without merit.[27] Lastly, although Olafson's calls to his attorney were limited at the request of that attorney, Olafson regularly spoke with his attorney on the phone, he regularly spoke with his family, and he had alternative means to communicate with his attorney and family. While Olafson desired unlimited phone use, he has no constitutional right to such use. See Beaulieu, 690 F.3d at 1039.

---

[27] An NDSH record reveals that, on one occasion, a staff member who is not a defendant told a caller to "please call back later" because the staff member did not recognize the name of the caller and Olafson refused to cooperate with identifying the caller. (Doc. #92-55, p. 11).

Olafson has not met his burden of setting forth facts showing any genuine issue for trial on this claim. Laber, Schulz, and Carr should be granted summary judgment on Olafson's claim regarding telephone access restrictions.

### 7.  Deprivation of Religious Mail

Olafson alleges that Travis Bullock, Chad Schultz, and Randy Switters threw away his religious mail. (Doc. #17, pp. 2-3). He also contends that Wanda Bear, Della Lee, Shawn Lee, JoMarie Wiest, and Ann Schulz would not allow him to "have a religious bible" or "religious bible study material"[28] that he received, presumably through the mail, from Charles F. Stanley.[29] (Doc. #18, pp. 1-2).

In affidavits, Switters, Bear, Della Lee, Shawn Lee, Wiest, and Ann Schulz state that their job duties did not include handling any mail and that they did not "deprive Olafson of his religious bible or religious bible study material." (Doc. #92-4, p. 3; Doc. #92-11, p. 2; Doc. #92-12, p. 2; Doc. #92-18, p. 2; Doc. #92-20, p. 2; Doc. #92-21, p. 2). In other affidavits, Chad Schultz and Bullock, who were both responsible for handling mail, state that they never threw away or withheld any of Olafson's religious mail.[30] (Doc. #92-5, p. 4; Doc. #92-16, p. 4). An NDSH record reveals that on December 21, 2010, security staff withheld a religious magazine because Olafson did not submit a

---

[28] In the October 16, 2016, and November 16, 2016 orders, the court determined that since Olafson had not alleged any interference with his religious mail had infringed his ability to practice his religion, he had not stated a plausible claim related to his ability to exercise his religion. (See Doc. #16, p. 18; Doc. #21, p. 12).

[29] Charles F. Stanley is a pastor, author, and the founder of In Touch Ministries. In Touch Ministries, https://www.intouch.org/about-us/meet-dr-charles-stanley, (last visited August 11, 2017).

[30] Schultz and Bullock state that the only mail not distributed to Olafson included "bulk mail, non-therapeutic mail, and contraband." (Doc. #92-5, p. 4).

"Property Request" for the magazine. (Doc. #92-60, p. 2). On a Property Request form, a resident may request to receive new property, exchange property, donate property, or have property destroyed. Security staff then respond to a resident's Property Request. (See, e.g., Doc. #92-65). According to NDSH policy regarding personal property, residents may keep in their possession only a limited number of the items which have been approved by security staff. (Doc. #92-35, p. 12).

Defendants, citing the April 2014 resident handbook, contend that "residents may not store subscriptions in their room; rather, the administration holds and stores such items for them." (Doc. #92, p. 22). But, the handbook in effect in December 2010 does not include that provision. (See Doc. #92-35, pp. 11-12). Defendants further state that no NDSH records demonstrate that staff discarded any religious magazine or withheld it for any reason other than Olafson's failure to submit a Property Request form. (Doc. #92, p. 22). Defendants also note that Olafson "had numerous magazines and religious books in his possession that he stored at [NDSH]." (Doc. #92-38) (citing Doc. #92-66) (Olafson's approved personal property list, which included seventeen religious books and study guides and two magazines). In response, Olafson contends only that he "shouldn't have to submit a property request for religious items." (Doc. #104, p. 5).

Olafson has a First Amendment right to receive mail. Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998). That right may be restricted only to further legitimate institutional interests. Turner, 482 U.S. at 89; see also Williams v. Wittrock, No. 15-CV-4043-DEO, 2015 WL 3649590, at *4 (N.D. Iowa June 11, 2015) (applying the Turner test to civilly committed sexually violent predator's claim that mail was restricted and

finding that the facility likely had legitimate treatment and safety interests which justified screening mail).

Evidence which the defendants filed shows that Switters, Bear, Della Lee, Shawn Lee, Wiest, and Ann Schulz did not handle any mail, and no evidence demonstrates that Chad Schultz or Bullock threw away any religious mail. Additionally, a requirement that personal property be approved furthers legitimate NDSH security and safety interests. Olafson has not met his burden of setting forth facts showing any genuine issue for trial on this claim. Switters, Bear, Della Lee, Shawn Lee, Wiest, Ann Schulz, Chad Schultz, and Bullock should be granted summary judgment on Olafson's claim regarding deprivation of religious mail.

## 8.    Deprivation of Personal Property

In his complaint and supplements, Olafson appears to allege two claims related to deprivation of his personal property. First, he alleges that Chad Schultz and Travis Bullock "destroyed" his personal property, including photographs, "treatment material," and legal work, after Olafson went from NDSH to the custody of the DOCR.[31] (Doc. #15, pp. 1-2; Doc. #18, p. 2). Second, Olafson alleges that Schultz compelled him to donate "all of [his] personal property, . . . all of [his] hygiene items, [and] all of [his] cell hobby items . . . to the volunteers store at [NDSH]." (Doc. #7, p. 7). He states that he "lost a lot of personal . . . items," including a television set, compact disc player, adapter, family photographs, and "other items," and that he "believe[s]" his personal property remains

---

[31] Olafson also asserts that Schultz and Bullock destroyed his personal property because Olafson was in "administrative segregation lockdown, and because [he] was being transferred to the NDSP." (Doc. #17, p. 3).  The timing of the alleged destruction of property is unclear.

at the NDSH store.[32] (Doc. #12, p. 2). In response to the motion to dismiss, Olafson clarifies that he was "forced to donate . . . NDSP property items" which he had purchased in 2012 and 2013 while in custody at NDSP. Id. at 11. With his response, Olafson attached sales order forms for items he purchased during his 2012-2013 incarceration at NDSP. (See Doc. #104-2, pp. 3-17). He states that he was told to donate that property or it would be destroyed.[33]

Olafson's personal property interests are protected by the Fourth Amendment's prohibition against unreasonable seizures. Beaulieu, 690 F.3d at 1034. "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." Id. (quoting Pepper v. Village of Oak Park, 430 F.3d 805, 809 (7th Cir. 2005)). "To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. at 1034-35 (quoting Baribeau v. City of Minneapolis., 596 F.3d 465, 483 (8th Cir. 2010)) (per curiam).

As previously discussed, Olafson was transferred to the SCCC/NDSP on three occasions. He was at those correctional facilities (1) from December 23, 2011, to October 10, 2012, (2) from November 30, 2012, to November 6, 2013, and (3) from March 26,

---

[32] Although a person in state custody is entitled to due process before deprivation of property in which there is a protected property interest, the court did not address that claim in its October 16, 2016 or its November 16, 2016 orders because Olafson had not alleged he was not afforded due process before any deprivation of his property. (See Doc. #16, p. 20 n.9; Doc. #21, p. 14 n.4).

[33] In Olafson's response, he does not state who allegedly told him to donate the property, but the court presumes he referred to Schultz since his complaint and supplements allege that Schultz coerced him to donate his property.

32

2014, through the current date. On each of the dates Olafson was transferred to SCCC, it was because had been charged with assaulting an NDSH staff member. Because of the multiple transfers, it is unclear when Olafson contends that Schultz and Bullock destroyed his personal property.

In affidavits, Schultz and Bullock state that DOCR does not accept any personal property at the time of transfer. (Doc. #92-5; Doc. #92-16). They further state that NDSH does not store a resident's property after that resident no longer resides at the facility but that the resident may make arrangements for someone else to pick up that property, to have that property mailed out, or to donate that property. Id.; (see also Doc. #92-34, p. 3 and Doc. #92-35, pp. 2, 7, 12, 17, 23, 28) (NDSH personal property policies); (Doc. #92-64) (NDSH policy regarding disposal of abandoned property). Any property which is left at NDSH is destroyed after ninety days. Id.

Affidavits of Schultz and Bullock only address Olafson's 2014 transfer from NDSH to DOCR, likely because Olafson did not make clear when he alleges that they destroyed his property. Schultz and Bullock state that on March 25, 2014—two days before Olafson's last transfer to SCCC—Olafson submitted a Property Request form, indicating he wanted his "papers" destroyed and his "bible" donated, and that Olafson's "papers" and "bible" were handled in accordance with his request. (Doc. #92-5; Doc. #92-16); (see also Doc. #92-65) (Olafson's Property Request form). Schultz and Bullock state that Olafson's mother picked up his remaining property on May 27, 2014. Id. (see also Doc. #92-66) (form signed by Olafson's mother stating that she received Olafson's property on May 27, 2014). Schultz and Bullock further state that they never destroyed or ordered anyone else to destroy Olafson's personal property. Olafson provides no facts to the contrary.

With regard to Olafson's claim that Schultz coerced him to donate property that he had purchased at NDSP in 2012 and 2013, Olafson's evidence demonstrates that he purchased a television set, compact disc player, and adapter at NDSP in March, April, and September 2012. (Doc. #104-2, pp. 4, 8, 12). Olafson submitted additional sales order forms, demonstrating that he purchased other items—in addition to the television set, compact disc player, and adapter—during his incarceration at NDSP from December 23, 2011, to October 10, 2012.[34] Id. at 3-14. Although an NDSH resident's property is inventoried when that resident is admitted, (see Doc. #92-64), neither plaintiff nor defendants provided an inventory of the property Olafson possessed when he returned to NDSH on October 10, 2012.

Shortly after his return to NDSH on October 10, 2012, Olafson was again arrested for assaulting an NDSH staff member and was transferred to SCCC on November 30, 2012. After he was convicted of that offense, he was transferred to the NDSP. Olafson remained at the NDSP until November 6, 2013. Olafson submitted sales order forms from that period of incarceration, demonstrating that he purchased several items at NDSP. See id. at pp. 15-17. Again, although an NDSH resident's property is inventoried when that resident is admitted, (see Doc. #92-64), neither plaintiff nor defendants have provided an inventory of the property Olafson possessed when he returned to NDSH on November 6, 2013.

An NDSH record shows that on December 10, 2012, Olafson requested that all of his personal property be donated except his envelopes, stamps, socks, shirts, and

---

[34] The court recognizes that Olafson was incarcerated at the SCCC at the beginning of the period from December 23, 2011, to October 10, 2012. But, the record does not reflect when Olafson was transferred to the NDSP from SCCC.

underwear, which he requested be delivered to him at SCCC. (Doc. #107-2). Thus, if Olafson had left the television, compact disc player, adapter, and other items he purchased in 2012 at NDSH prior to his transfer to SCCC, that property was covered by Olafson's December 10, 2012 donation request.[35] A January 15, 2014 NDSH progress note states that Olafson had requested that his donated property be returned to him and that the chaplain informed Olafson that "would not be possible." (Doc. #92-67). Neither side explains what property Olafson donated prior to that date or when it was donated, but the court presumes that it relates to Olafson's December 10, 2012 donation request, since no other property requests prior to the January 15, 2014 progress note appear in the record. NDSH's list of the property that Olafson possessed in 2014 contains only one item—an alarm clock—which matches any of those items Olafson purchased at NDSP during his periods of incarceration in 2012 and 2013. (Compare Doc. #104-2, pp. 3-7, with Doc. #92-66). While it is apparent that Olafson no longer possessed the majority of items he purchased at NDSP, the record does not clearly establish what happened to those items.

In their reply brief, defendants state that Olafson "offers no evidence that, upon his return, [he] ever inquired about or submitted any complaints regarding missing property." (Doc. #107, p. 7). Not including Olafson's request to have his donated property returned to him—evidence which defendants submitted—the court's review of the record is consistent with defendants' statement. In their affidavits, Bullock and Schultz state that they did not coerce Olafson to donate his property and that they are

---

[35] The record contains no Property Request form relating to any property Olafson might have brought with him from the NDSP when he returned to the NDSH on November 6, 2013.

not aware of anyone else having coerced Olafson to donate his property. (Doc. #92-5; Doc. #92-16). When Olafson requested that his property be donated on December 10, 2012, he had been incarcerated at SCCC for about eleven days; Schultz would not have been in a position to coerce him during that time since Olafson was not at NDSH. Other than Olafson's conclusory statements, he has set forth no evidence showing that Schultz coerced him to donate property or that either Schultz or Bullock destroyed his property. Olafson has not met his burden of setting forth facts showing any genuine issue for trial on this claim. No reasonable juror could conclude in his favor on this claim. Schultz and Bullock should be granted summary judgment on Olafson's deprivation of personal property claim.

### 9.    Qualified Immunity

Alternatively to their contention that they violated no constitutional rights, defendants argue that they are entitled to qualified immunity. (Doc. #92, pp. 43-44). They assert that even if the court finds that the defendants' actions violated Olafson's constitutional rights, "there is no case law that would put them on notice that they would be subject to § 1983 liability for their actions." Id. at 45.

Qualified immunity shields a government official from liability unless (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the conduct at issue. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)). Courts have discretion in deciding which prong of the qualified immunity

analysis to address first and need not address the remaining prong if the first is decided in the defendant's favor. Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). As discussed above, there are no genuine disputes of material fact as to the alleged constitutional violations; thus, the court need not address the remaining prong of the qualified immunity inquiry.

## 10.     Request for Release

In response to defendants' motion to dismiss, Olafson requests that he be released from his civil commitment and that he be placed on electronic monitoring instead of being returned to NDSH after he is released from prison. (Doc. #104, p. 11; Doc. #104-1, p. 1). Olafson's request for release is not properly brought in this § 1983 action. See Franklin v. Webb, 653 F.2d 362, 363 (8th Cir. 1981) (citing Preiser v. Rodriguez, 411 U.S. 475, 500 (1973)) (stating that habeas corpus provides prisoners the exclusive federal remedy for challenges to the fact or duration of their confinement); see also Carter v. Bickhaus, 142 F. App'x 937, 938 (8th Cir. 2005) (per curiam unpublished opinion) (applying the same rule in the context of a civilly committed individual seeking release in a 42 U.S.C. § 1983 action). Since the relief he seeks cannot be granted in this action, any claims requesting release should be dismissed.

## Conclusion

For the reasons discussed above, it is **RECOMMENDED** that defendants' motion for summary judgment, (Doc. #90), be **GRANTED** and that, except as to previously stayed claims, Olafson's complaint be **DISMISSED** with prejudice. If the recommendation is adopted, judgment in favor of defendants other than Kerry Wicks, Alex Schweitzer, and Dr. Mark Rodlund should be entered, and the case should remain

stayed in accordance with the court's previous orders regarding claims against Wicks, Schweitzer, and Rodlund. Because any appeal would be frivolous and could not be taken in good faith, it is further **RECOMMENDED** that the court find that any appeal may not be taken in forma pauperis.

Dated this 22nd day of August, 2017.

 _/s/ Alice R. Senechal_____
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT[36]

Any party may object to this Report and Recommendation by filing with the Clerk of Court no later than September 5, 2017, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[36] See Fed. R. Civ. P. 72(b); D.N.D. Civ. L.R. 72.1.